UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

                Plaintiff,

      v.

RONNIE PARKER,

                Defendants.

_____

<u>REPORT & RECOMMENDATION</u>

14-CR-6045W

## <u>PRELIMINARY STATEMENT</u>

By Order of Hon. Elizabeth A. Wolford, United States District Judge, dated April 10, 2014, all pretrial matters in the above captioned case have been referred to this Court pursuant to 28 U.S.C. §§ 636(b)(1)(A)-(B).  (Docket # 12).

On April 10, 2014, the grand jury returned a one-count indictment charging defendant Ronnie Parker ("Parker") with making a threat against the President on February 7, 2014, in violation of 18 U.S.C. § 871.  (Docket # 11).  Currently pending before the Court are motions by Parker to suppress statements and to dismiss the indictment, as to which evidentiary hearings were held.  (Docket ## 37, 44, 45, 48). [1]  For the reasons discussed below, I recommend that the district court deny Parker's motion to suppress statements.  I further recommend that the district court deny Parker's motion to dismiss the indictment.

---

[1]  Defendant filed omnibus motions seeking other forms of relief, namely, Rule 404(b), 608 and 609 evidence, *Jencks* material, preservation of rough notes, and leave to file additional motions.  (Docket # 37).  Each of the above-referenced motions was decided by the undersigned or resolved by the parties in open court on January 8, 2015.  (Docket ## 39, 40).

## FACTUAL BACKGROUND

**I.      Agent Joel Blackerby's Testimony**

Joel Blackerby testified that he had been employed as an agent with the United

States Secret Service for approximately nineteen years.  (Tr. 90).[2]  Blackerby's responsibilities

include investigating threats made against the President.  (*Id.*).

Blackerby testified that in the late afternoon of February 6, 2014, he was

contacted by Douglas Landy, MD, who reported that his patient Ronald Parker had sought

treatment at the Clifton Springs Hospital (the "Hospital") because he was hearing voices

directing him to kill the President, which were scaring him.  (Tr. 91, 108, 113, 120, 125-26).  In

response to Blackerby's questions, Landy disclosed that Parker previously had been treated at the

Hospital and that his prior medication regimen would be recommended to address his current

auditory hallucinations.  (Tr. 111-12, 125-28).  Based upon his conversation with Landy,

Blackerby understood that Parker would be held at the Hospital for several days and assumed

that he would not be permitted to leave the second floor psychiatric unit.  (Tr. 110-11, 114).

Blackerby told Landy that he was not permitted to obtain additional medical information about

Parker unless Parker signed an authorization to release such information to Blackerby.

(Tr. 141-42).

Blackerby testified that he told Landy he would like to interview Parker and asked

Landy, "Can we set this time up?"  Landy agreed, and Blackerby asked what the "best time"

would be.  (Tr. 126).  Landy replied, "Not the 6th, because [Parker] was still a little upset and

had been off his medication," but agreed that the following day would be more appropriate.

(Tr. 126-27).  Blackerby testified that he told Landy that the purpose of the interview was to

---

[2]  The transcripts of the February 3 and 6, 2015 hearings shall be referred to as "Tr. __."  (Docket ## 44, 45).

determine the level of dangerousness posed by Parker's threats. (Tr. 128-30). He further advised Landy that he would discuss the results of his investigation with the United States Attorney's Office, which would make the determination whether to arrest Parker. (*Id.*). According to Blackerby, Landy did not ask any additional questions about the investigation or the possible consequences to Parker. (Tr. 128-31). Blackerby testified that he did not tell Landy that the investigation "probably won't turn out to be anything" or otherwise suggest that it was routine and would be unlikely to result in criminal charges. (Tr. 108-09).

On February 7, 2014, Blackerby traveled to the Hospital to interview Parker. (Tr. 92). He arrived at approximately 10:00 a.m. and met with Landy and Nurse Kimberly Dean outside Landy's second floor office. (Tr. 92-94). Blackerby was wearing khaki pants and a polo shirt and was not carrying a firearm. (Tr. 92). Blackerby reiterated that he was investigating Parker's threats against the President. (Tr. 93-94). According to Blackerby, he questioned Landy and Dean in order to ensure that Parker had "a clear mind and [was] okay with the interview." (Tr. 94). Blackerby testified that neither Landy nor Dean expressed reservations about Parker's ability or fitness to proceed with the interview. (*Id.*).

Blackerby and Landy entered a conference room near Landy's office. (Tr. 95). Blackerby described the room as approximately eight by twelve feet in size with a table and chairs. (Tr. 95-96; Government's Exhibits ("G. Exs.") 1A–1E). Dean left and returned with Parker, who was not handcuffed or otherwise restrained. (Tr. 97-98). Blackerby introduced himself as a special agent with the Secret Service and asked Parker if he knew the purpose of Blackerby's visit. (Tr. 98). According to Blackerby, Parker responded, "yes." (Tr. 98, 131). Blackerby testified that he informed Parker that the interview was "totally voluntary." (Tr. 99).

Blackerby testified that he sat at the head of the conference table, and Landy and Parker sat next to him on opposite sides of the table.  (Tr. 99-100; G. Ex. 1D).  Dean sat next to Parker on his right side.  (*Id.*).  Parker sat in the chair closest to the door, with his back to the door.  (*Id.*).  During the interview, the conference room door was closed but not locked, and no security guards were present.  (Tr. 99-100).  Landy and Dean were present for the entirety of the interview, which lasted approximately one hour.  (Tr. 101-02, 138).

After the participants were seated, Blackerby told Parker that he had been informed that Parker had come to the Hospital the previous evening and had told the staff that he had been hearing voices directing him to kill the President.  (Tr. 101, 115).  Blackerby advised Parker that he was there to investigate those threats.  (*Id.*).  Blackerby did not administer *Miranda* warnings to Parker.  (*Id.*).  According to Blackerby, he informed Parker that the interview was voluntary, that Parker was not required to talk to him and that Parker could leave at any time.  (*Id.*).

Blackerby asked Parker whether it was accurate that voices were telling Parker to kill the President, and Parker responded, "yes."  (Tr. 132).  Blackerby asked Parker if he had "ever thought about how [Parker] would . . . go about killing the President?"  (Tr. 136, 139, 140-41).  Blackerby testified that Parker provided a detailed explanation of his plan to kill the President.  (*Id.*).

Blackerby characterized Parker's demeanor as calm and cooperative and his physical appearance as slightly disheveled and tired.  (Tr. 106, 111).  According to Blackerby, Parker did not fall asleep during the interview and did not appear to be intoxicated or under the influence of any drugs or medications.  (Tr. 132).  Blackerby testified that Parker did not raise his voice or appear angry during the interview, although his demeanor changed at one point

4

towards the end of the interview and his eyes became fixated on Blackerby and his facial expression intensified.  (Tr. 115-16, 119).  At that point, Blackerby asked Parker whether the voices were speaking to him, and Parker responded, "yes."  (*Id.*).  Parker stated that the voices were telling him to "take [Blackerby's] gun, shoot [Blackerby] and everyone in the building." (*Id.*).  Parker told Blackerby that he heard voices instructing him to kill the President, but that his "inner thoughts [were] that he should not."  (Tr. 117-18).  Blackerby testified that he believed that Parker was suffering from an auditory hallucination.  (*Id.*).

Blackerby testified that he did not trick or mislead Parker, promise him anything, or threaten or make physical contact with him during the interview.  (Tr. 106-08).  Blackerby testified that Parker appeared to understand his questions, answered them and never requested to leave.  (*Id.*).  According to Blackerby, Parker was free to terminate and leave the interview at any time.  (Tr. 107).

During the interview, Blackerby provided Parker a "SSF 1945" form authorizing Blackerby to review his medical files and to speak with his treating physicians.  (Tr. 102-03; G. Ex. 2).  Blackerby testified that he told Parker he was not required to sign the form, but if he did so, he would be authorizing Blackerby to review his medical files and to speak with Landy about the reported threats.  (Tr. 104, 133).  Parker appeared to read the form.  (Tr. 104, 133-34). Blackerby asked Parker whether signing the form would be "something that you would be willing to do for me," and Parker responded affirmatively and signed the form.  (Tr. 104; G. Ex. 2).

Blackerby also asked Parker if he could photograph Parker's face and scars. (Tr. 105).  Blackerby testified that he told Parker that he did not have to agree, and Parker refused, stating that the voices would not permit the photographs.  (Tr. 105, 121).

At the conclusion of the interview, Blackerby thanked Parker for his time, and Parker stood, opened the door and walked out of the room.  (Tr. 106).  After Parker left, Blackerby met with Landy and Dean to review Parker's medical files.  (Tr. 138).  During that meeting, Landy told Blackerby that Parker was capable of formulating a plan and that Parker tended to stop taking his medications when he was not hospitalized.  (Tr. 143).

Blackerby testified that Landy subsequently contacted him to inform him that Parker would be discharged from the Hospital.  (Tr. 122).  Landy told Blackerby that he had arranged for Parker to enter outpatient, long-term care for continued treatment.  (Tr. 123).  Parker did not enter that treatment program, however, because he was arrested upon his discharge from the Hospital.  (*Id.*).

Parker's statements to Landy during the February 7 interview form the basis of the criminal charge against him.

## II.   <u>Dr. Douglas Landy's Testimony</u>

Dr. Landy testified that he has been a practicing psychiatrist for approximately twenty-eight years and has been a psychiatrist at Clifton Springs Hospital for approximately three years.  (Tr. 5).  Landy's responsibilities include providing inpatient psychiatric care, treating emergency room patients and conducting psychiatric consultations.  (*Id.*).

Landy testified that Parker was hospitalized on two occasions for schizophrenia, the second of which was in February 2014.  (Tr. 5-7).  On that second occasion, Parker came to the emergency room complaining of increasing auditory and visual hallucinations that were scaring him.  (Tr. 7).  Parker reported seeing a person who told him to do "bad things."  (Tr. 10-11).  He also reported seeing snakes from time to time.  (*Id.*).

6

Landy testified that Parker arrived at the Hospital on February 5, 2014, and was admitted for inpatient care.  (Tr. 6, 8).  Landy explained that Parker was admitted on an involuntary status and was not free to leave absent approved discharge or a court order. (Tr. 6-9).

Landy testified that Parker's hallucinations and apparent distress caused him to doubt the efficacy of Parker's current medication regimen.  (Tr. 11-12).  As a result, Landy increased the dosage of Prolixin based upon Parker's report that he previously had responded well to it and prescribed Ativan.  (Tr. 12-13).  Landy explained that both medications can cause feelings of "sluggish[ness]" or "fuzzy-mindedness," although impairment is not common. (Tr. 13-15).  Landy opined that Parker's mental capacities were not impaired by the medications, although Parker did continue to experience hallucinations over the next several days.  (Tr. 13, 37).

Landy testified that he called the Secret Service on February 6, 2014 to report that Parker had threatened to kill the President.  (Tr. 16-17, 53).  Landy spoke with Blackerby, who requested to interview Parker.  (Tr. 53-55).  Landy and Blackerby did not discuss the possibility of criminal charges.  (Tr. 55).  According to Landy, Blackerby stated that he merely wanted to speak with Parker and that would be the end of it.  (Tr. 58).

Prior to the interview on February 7, 2014, Landy told Parker that he would be meeting with a Secret Service agent who wanted to speak with him and believes he told him that the interview would be the end of the matter.  (Tr. 38-39, 58).

Landy testified that the interview, which lasted approximately one and one-half hours, took place mid-morning in a hospital conference room.  (Tr. 17-19, 40-43; G. Exs. 1A-1E).  Prior to starting, Blackerby confirmed with Landy that Parker was "okay" to be

7

interviewed that day.  (Tr. 39).  Landy testified that he told Blackerby before the interview that "if it looks like there's a problem, we're going to have to stop."  (Tr. 20).  Parker entered the conference room unrestrained.  (Tr. 43).  Landy, Dean, Parker and Blackerby were present during the interview.  (Tr. 17-18, 44).  Blackerby was dressed in civilian clothes.  (Tr. 44, 62).  Landy testified that there were no other law enforcement personnel or hospital security staff present in or posted outside the conference room.  (Tr. 44).

Landy was present throughout the interview to "observe" and "support" Parker.  (Tr. 20, 45-46).  Landy testified that he would have terminated the interview "if it looked like Parker was having difficulty."  (Tr. 20).  According to Landy, neither he nor Dean said anything during the interview.  (Tr. 19-20).  Landy opined that Parker understood why he was being interviewed.  (Tr. 45).  Landy testified that Parker appeared to be "doing pretty well in terms of his psychosis" during the interview and did not demonstrate any symptoms of thought disorder, although he displayed a cautious, constricted affect.  (Tr. 23-25, 38).  Landy acknowledged that Parker experienced hallucinations from the time he was admitted to the Hospital until some time after the interview.  (Tr. 59-62).

Landy testified that Blackerby told Parker that the interview was voluntary and that Parker did not have to be there.  (Tr. 45).  According to Landy, Parker's affect changed at one point during the interview, and Parker's eyes displayed a flat glaring appearance and his jaw muscle began to twitch.  (Tr. 26).  At that time, Parker told Blackerby that he wanted to take Blackerby's gun and shoot Blackerby and others.  (*Id.*).  Landy explained:

> I was concerned that Mr. Parker was starting to have a lot of difficulty holding it together for the interview, and I decided to wait and see how the agent responded to it and what Mr. Parker would do before allowing it to continue or deciding to terminate.

(Tr. 27).  Landy testified that Parker then "talked very straightforwardly with the agent," Blackerby responded "quite well" and "the interview proceeded." (Tr. 27).  Landy decided against terminating the interview at that time.  (*Id.*).

Landy testified that Blackerby never raised his voice, made any threats, or physically assaulted Parker.  (Tr. 45-46).  Landy characterized Blackerby's demeanor as serious but pleasant and testified that Blackerby used open-ended questions.  (Tr. 47-48).  Landy testified that Parker never asked to leave the conference room or expressed discomfort with the interview.  (Tr. 65).

Landy testified that he was surprised by the level of detail Parker provided in describing how he would execute his "ideas." (Tr. 19).  Landy also testified that Parker told Blackerby that Prolixin had been previously ineffective in treating his mental impairments. (Tr. 29, 38).  Landy subsequently discontinued Parker's Prolixin prescription and prescribed a different antipsychotic medication.  (Tr. 30).

Landy testified that he assessed Parker's Global Assessment of Functioning ("GAF") to be 21, indicating that Parker's behavior was driven by hallucinations.  (Tr. 31-32). Parker remained in the Hospital until his discharge by Landy on February 28, 2014.  (Tr. 32-33). During his stay, he suffered a pulmonary embolism and was transferred to another unit for treatment.  (Tr. 33-34, 49).  After approximately five days, Parker returned to the psychiatric ward.  (Tr. 34, 49).  When he returned, Parker informed Landy that he had no recollection of his interview by Blackerby or his arrival at the Hospital.  (Tr. 50).  Parker reported that he had consumed narcotics before his admission to the Hospital and could not recall subsequent events. (*Id.*).  Landy testified that the pulmonary embolism may have caused retrograde amnesia.

(Tr. 51-52).  Landy explained that Parker's purported memory failure did not mean that he had

not understood what was happening at the time of the interview on February 7, 2014.  (Tr. 50).

Landy explained that Parker's GAF at discharge was 38, which indicated that he

was still experiencing serious symptoms, including hallucinations, but that they were no longer

driving his behavior and that he could function with reasonable outpatient support.  (Tr. 33, 35).

Landy had arranged for follow-up treatment for Parker upon his discharge.  (Tr. 35).


III.   **Nurse Kimberly Dean's Testimony**

Kimberly Dean ("Dean"), the unit coordinator for the Hospital's inpatient

psychiatric unit, also testified.  (Tr. 67).  Dean testified that she had been the unit coordinator

since 2011 and that Parker had been a patient at the Hospital on several occasions.  (Tr. 68).

Dean attended Blackerby's interview of Parker in February 2014.  (Tr. 69).  Dean testified that

Parker occupied a single room on a locked ward.  (Tr. 72-74).  According to Dean, although

Parker was not able to leave the ward, he was free to leave his room at will and walk

unaccompanied to any unlocked areas of the ward, including a lounge area and the conference

room where the interview took place.  (Tr. 72-73, 78).

Dean testified that she spoke with Parker prior to the interview.  (Tr. 72).

According to Dean, she told Parker what "was going on" and asked him if he wanted her to

accompany him into the interview.  (Tr. 75, 79).  Parker responded affirmatively.  (*Id.*).  After

Blackerby arrived at the Hospital, Dean went to Parker's room and told him that an agent was

there to see him.  (Tr. 72).  Parker was on his bed, but Dean could not tell if he was sleeping.

(Tr. 74).  Dean testified that Parker's antipsychotic medications had been restarted and they can

have a sedative effect.  (Tr. 73).  The interview occurred shortly after breakfast, and Dean

explained that it was not unusual for patients to return to bed after taking their morning medications.  (Tr. 73-74).

After she spoke to him, Parker rolled over, acknowledged her, and got out of bed. (Tr. 72, 74, 78-79).  Dean and Parker walked together to the conference room.  (*Id.*).  Dean described Parker as "mellow," but testified that he did not appear tired.  (Tr. 74).  Dean testified that she did not place her hands on Parker, but merely walked by his side to the interview room. (Tr. 78).

Dean testified that the interview lasted approximately one hour.  (Tr. 69).  Dean testified that Blackerby identified himself as a Secret Service agent and told Parker that he was there to interview him concerning a threat that he made to kill the President.  (Tr. 82-83). According to Dean, Blackerby informed Parker that he had been notified by Landy that Parker had made certain statements, that Landy was required to report the statements to Blackerby and that Blackerby was there to gather information.  (Tr. 76).  Dean did not recall that Blackerby discussed the possibility of arrest or criminal charges or the use to which the information might be put.  (Tr. 76-77).  According to Dean, Parker did not ask any questions about what would happen to him.  (*Id.*).

Dean described Blackerby's tone during the interview as "conversational" and his questioning as "laid back," "not push[y]."  (Tr. 70-71).  According to Dean, Blackerby questioned Parker as if he were "just gathering data to do an assessment."  (Tr. 72, 80).

Dean characterized Parker's demeanor in the interview as soft-spoken and calm, although she recalled that he became agitated at one point, looked off to the side and told Blackerby, in sum and substance, "They're telling me to grab your gun and shoot everybody." (Tr. 70).  Other than that one incident, Parker's demeanor was calm and he did not raise his

voice.  (Tr. 70-71).  Parker appeared to understand Blackerby's questions and provided generally

responsive answers.  (Tr. 74, 84).  According to Dean, Parker never asked to leave the interview,

did not express any discomfort during the interview, did not appear confused about the purpose

of the interview or any particular question, and did not seem sedated or intoxicated.  (Tr. 77,

83-84).  Blackerby never threatened or made promises to Parker during the interview.

(Tr. 80-81, 83).  Dean testified that she would have terminated the interview if she had had any

"mental health concerns."  (Tr. 81).

Dean was present when Blackerby presented Parker with a consent form.

(Tr. 85).  According to Dean, Blackerby asked Parker "if it was okay if they accessed his medical

records."  (*Id.*).  Parker responded "yes" and signed the consent form.  (*Id.*).


## REPORT & RECOMMENDATION

### I.    Motion to Suppress Statements

I turn first to Parker's motion to suppress the statements he made to Blackerby

during the interview on February 7, 2014.[3]  Parker seeks suppression on the grounds that his

statements were obtained in violation of *Miranda v. Arizona*, that they were not voluntary and

their use is protected by the psychotherapist-patient privilege.  (Docket # 37 at 4-9).

### A.    *Miranda*

Statements made during custodial interrogation are generally inadmissible unless

a suspect first has been advised of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436

(1966).  In *Miranda*, the Supreme Court held that the prosecution may not use a defendant's

statements that are the product of custodial interrogation unless it demonstrates that the

---

[3]  The government has represented that it does not seek to introduce any statements Parker made to Landy.
(Docket # 38 at 9).

defendant was first warned of his Fifth Amendment privilege against self-incrimination and then voluntarily waived that right. *Miranda v. Arizona*, 384 U.S. at 444. As the Second Circuit has stated:

> [I]nterrogation consists of express questioning or its functional equivalent. . . . [T]he overarching "custody" question is whether a reasonable person in the suspect's position would have understood [himself] to be subjected to restraints comparable to those associated with a formal arrest.

*United States v. FNU LNU*, 653 F.3d 144, 148, 153 (2d Cir. 2011) (internal quotations and brackets omitted).

For *Miranda* purposes, "'custody' is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion." *Howes v. Fields*, 132 S. Ct. 1181, 1189 (2012); *United States v. FNU LNU*, 653 F.3d at 152-53 ("[w]e pause to clarify that 'custody' for *Miranda* purposes is not coterminous with, though it is often informed by, the colloquial understanding of custody"). In determining whether a defendant was in custody, a court must first determine whether, "in light of the objective circumstances of the interrogation, . . . a reasonable person [would] have felt that he or she was not at liberty to terminate the interrogation and leave." *Howes v. Fields*, 132 S. Ct. at 1189 (internal citations and quotations omitted); *see also United States v. Newton*, 369 F.3d 659, 672 (2d Cir.) (the court must ask "whether a reasonable person would have thought he was free to leave the police encounter at issue"), *cert. denied*, 125 S. Ct. 371 (2004). If the answer is affirmative, the inquiry concludes. *United States v. Newton*, 369 F.3d at 672. If, on the other hand, a reasonable person would not have felt free to leave, the court must proceed to the second step of the analysis and determine whether a "reasonable person would have understood his freedom of action to have been curtailed to a degree associated with formal arrest." *Id.* (citing *California v. Beheler*, 463 U.S.

1121, 1125 (1983)).  "Only if the answer to this second question is yes was the person 'in custody for practical purposes' and 'entitled to the full panoply of protections prescribed by *Miranda*.'"  *Id.* (quoting *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984)).

Although the "free to leave" analysis is frequently employed in determining the custody issue, the analysis does not squarely apply in every case.  *Florida v. Bostick*, 501 U.S. 429, 436-37 (1991).  Under certain circumstances, an individual's freedom of movement may be restricted even though the individual may not be in "custody" within the meaning of *Miranda*. *Id.*; *see also Fields*, 132 S. Ct. at 1189 ("[n]ot all restraints on freedom of movement amount to custody for purposes of *Miranda*").  For instance, not all instances of imprisonment amount to *Miranda* custody.  *Fields*, 132 S. Ct. at 1191.

In circumstances in which an individual's freedom of movement is otherwise limited, "the 'free to leave' analysis . . . is inapplicable[,] . . . [and] the appropriate inquiry is whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter."  *Florida v. Bostick*, 501 U.S. at 436.; *see also Fields*, 132 S. Ct. at 1189 ("[w]e have decline[d] to accord talismanic power to the freedom-of-movement inquiry") (internal quotation omitted); *United States v. Infante*, 701 F.3d 386, 396 (1st Cir. 2012) ("[w]hen an individual is unable to 'leave' the place of the interrogation solely due to circumstances incident to medical treatment, the question is said to be slightly different: whether he or she was at liberty to terminate the interrogation and cause the [officers] to leave") (internal quotations omitted) (alteration in original), *cert. denied*, 133 S. Ct. 2841 (2013).  Thus, "the crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore

the police presence and go about his business." *Bostick*, 501 U.S. at 437 (quoting *Michigan v. Chesternut*, 486 U.S. 567, 569 (1988)).

"The determination of custody should focus on all of the features of the interrogation[,]" including, "the language that is used in summoning [the individual] to the interview and the manner in which the interrogation is conducted." *Fields*, 132 S. Ct. at 1192. Courts should also evaluate "the interrogation's duration; its location . . . ; whether the suspect volunteered for the interview; whether the officers used restraints; whether weapons were present and especially whether they were drawn; [and] whether officers told the suspect he was free to leave or under suspicion." *FNU LNU*, 653 F.3d at 153.

Having carefully reviewed the record, I conclude that Parker was not in "custody" for the purposes of *Miranda* when he was interviewed by Blackerby. Although Parker was not free to leave the Hospital's second floor, he was free to enter, exit and walk about any of its unsecured areas. In any event, his inability to leave the facility is not alone enough to conclude that he was in custody within the meaning of *Miranda* when he was interviewed in the psychiatric ward conference room. *See Fields*, 132 S. Ct. at 1194 (defendant not in custody for *Miranda* purposes when interviewed in jail conference room while serving term of incarceration for an unrelated crime; "[t]aking into account all of the circumstances of the questioning – including especially the undisputed fact that [defendant] was told that he was free to end the questioning and return to his cell – we hold that [defendant] was not in custody within the meaning of *Miranda*"); *United States v. Melancon*, 662 F.3d 708, 712 (5th Cir. 2011) ("the mere fact of the prison setting alone is insufficient to trigger the *Miranda* requirements"), *cert. denied*, 132 S. Ct. 2119 (2012); *United States v. Ashburn*, 2014 WL 7403851, *28-29 (E.D.N.Y. 2014)

(defendant "not in custody within the meaning of *Miranda*" despite being interviewed while incarcerated in correctional facility).

Indeed, several circuits have concluded that *Miranda* custody is not established merely because an interview occurs in a hospital where a defendant is receiving medical treatment. *See, e.g.*, *United States v. Berres*, 777 F.3d 1083, 1092 (10th Cir. 2015) (defendant who arrived voluntarily at hospital for psychiatric treatment not in custody when interviewed by law enforcement in hospital room); *United States v. Infante*, 701 F.3d at 398 (defendant not in custody when questioned by law enforcement in hospital room where defendant receiving medical treatment); *United States v. Jamison*, 509 F.3d 623, 625 (4th Cir. 2007) (defendant not in custody where his "freedom to terminate the interview was curtailed primarily by circumstances resulting from his injury and hospital admittance rather than by police restraint"); *United States v. New*, 491 F.3d 369, 373 (8th Cir. 2007) (defendant not in custody for *Miranda* purposes during interview that occurred in hospital room where defendant was "confined to his bed in a neck brace and under medication"); *Gren v. Greiner*, 89 F. App'x 754, 757 (2d Cir. 2004) (defendant not in custody when he made incriminating statements "while he was in the trauma room at the hospital, recovering from his injuries"); *United States v. Martin*, 781 F.2d 671, 673 (9th Cir. 1985) (defendant not in custody when questioned at the hospital where "no fact[s] . . . indicate[d] [that] law enforcement officials were in any way involved in [defendant's] hospitalization or did anything to extend [defendant's] hospital stay and treatment"). *But see United States v. Robinson*, 439 F.2d 553, 560 (D.C. Cir. 1970) (*Miranda* warnings should have been administered to defendant who was involuntarily hospitalized at mental health hospital before being interrogated by three law enforcement officers through the use of questions

16

designed to bluff him into making admissions; "[t]he situation of [defendant] during the interrogation cannot in any rational manner be distinguished from custodial interrogation").

The totality of the circumstances surrounding the interview in this case lead me to conclude that Parker was not in custody during his interview by Blackerby.  Before the interview began, Blackerby clearly identified himself, disclosed the purpose for the interview, and informed Parker that the interview was voluntary and that he did not have to participate in it and could leave at any time.  *See Fields*, 132 S. Ct. at 1193 (although defendant did not initiate the interview, he "was told at the outset of the interrogation, and was reminded again thereafter, that he could leave and go back to his cell whenever he wanted"); *Infante*, 701 F.3d at 398 ("[law enforcement] informed [defendant] during each interview that he was not under arrest or in custody and that he did not have to speak with the officers, thereby communicating the non-confrontational nature of the interviews"); *United States v. New*, 491 F.3d at 373 (defendant not in custody where officer identified himself, explained the purpose of the interview, and informed defendant that he did not have to talk and could terminate the interview at any time).  In addition, both Landy and Dean had explained to Parker before the interview that he would be meeting with a Secret Service agent, and Parker was not restrained or otherwise physically compelled to enter the room or submit to the interview.  The room itself was unlocked, and Parker left the room at the conclusion of the interview through that unlocked door.

Additionally, the record does not suggest that the interview was conducted in a coercive manner.  Blackerby acceded to Landy's request to conduct the interview on the day following their phone call because Landy believed Parker's condition would be stronger that next day.  Before beginning the interview, Blackerby met with Landy and Dean to assure that they were "okay" with the interview and knew of no "mental health" reason not to proceed.

Landy and Dean were present during the interview and, as each testified, were prepared to stop the interview if they believed terminating the interview was appropriate for Parker's mental health. Blackerby, who was the only law enforcement officer present, wore civilian clothes and did not carry or display a weapon. Blackerby generally asked open-ended questions and spoke to Parker in a non-confrontational, conversational tone throughout the interview. Blackerby did not threaten, mislead or make promises to Parker to induce him to answer questions and did not physically restrain or touch Parker during the interview. The interview only lasted approximately sixty to ninety minutes, after which Parker left the unlocked conference room. Taking all of these facts into consideration, I conclude that Parker was not in custody within the meaning of *Miranda*.[4] *See Fields*, 132 S. Ct. at 1193 (incarcerated defendant not in *Miranda* custody during five to seven hour interview in conference room where he was repeatedly told that he could leave and was not restrained); *United States v. Berres*, 777 F.3d at 1092-93 (defendant in hospital room was not in custody when questioned for approximately one hour where he was not physically restrained, although he was not told that he was free to leave, and the officers wore plain clothes, did not display their weapons, and were not aggressive or

---

[4] Even if Parker could be said to have been in custody during the interview, it is not clear that *Miranda* would bar the government from introducing evidence of threats made by Parker during the interview. *See United States v. Vreeland*, 684 F.3d 653, 660-61 (6th Cir.) (false statements made during interview were not subject to suppression under *Miranda* because statements were themselves a criminal act), *cert. denied*, 133 S. Ct. 565 (2012); *United States v. Melancon*, 662 F.3d at 712 ("[e]ven if we concluded . . . that [defendant] was 'in custody' at the time of his [interview], we agree with the [g]overnment that the statements would have been admissible at his trial because they were themselves a criminal act[;] . . . [t]he exclusionary rule does not act as a bar to the prosecution of a crime where the statements themselves are the crime"); *United States v. Owuor*, 397 F. App'x 572, 575 (11th Cir. 2010) ("[defendant's] statements to the ICE agents in the visitation room were new crimes rather than statements that related to past crimes[;] [a]ccordingly, there is 'no fifth amendment problem'") (quoting *United States v. Kirk*, 528 F.2d 1057, 1061-62 (5th Cir. 1976)), *cert. denied*, 131 S. Ct. 1522 (2011); *United States v. Gordon*, 974 F.2d 1110, 1116 (9th Cir. 1992) (defendant's threats against the President were properly admitted; "[t]he statements [defendant] seeks to suppress were not merely evidence of a crime, but also the crime itself[;] . . . [i]n this situation, whether [defendant] received a *Miranda* warning is irrelevant"), *overruled on other grounds by Planned Parenthood of Columbia/Willamette, Inc. v. Am. Coalition of Life Activists*, 290 F.3d 1058 (9th Cir. 2002); *United States v. Mitchell*, 812 F.2d 1250, 1253 (9th Cir. 1987) ("[c]omitting a crime is far different from making an inculpatory statement, and the treatment we afford the two events differs accordingly[;] . . . [w]e do not believe that the exclusionary rule is the proper vehicle for determining whether a crime should be immunized from prosecution"), *overruled on other grounds by Planned Parenthood of Columbia/Willamette, Inc. v. Am. Coalition of Life Activists*, 290 F.3d at 1058.

confrontational); *Infante*, 701 F.3d at 397-98 (defendant not in custody where he was confined to hospital bed, the officers did not restrain or make physical contact with him, were not threatening, were dressed in plain clothes, and did not display weapons); *United States v. Highsmith*, 2007 WL 2406990, *5 (S.D. Fla. 2007) (defendant who was questioned about threats against an administrative law judge after he had voluntarily sought psychiatric treatment not in custody despite being in a locked psychiatric unit where he was free to move about the unit and to end the interview).

## B.  <u>Voluntariness</u>

I turn next to the question whether the non-custodial statements that Parker made to Blackerby were voluntary within the meaning of the Fifth Amendment.  *See Dickerson v. United States*, 530 U.S. 428, 433 (2000) ("a confession be voluntary to be admitted into evidence").  "A confession is not voluntary when obtained under circumstances that overbear the defendant's will at the time it is given."  *United States v Taylor*, 745 F.3d 15, 23 (2d Cir. 2014).

In examining whether a statement was made voluntarily, a court must consider the totality of the circumstances in which it was given "to determine whether the government agents' conduct 'was such as to overbear [a defendant's] will to resist and bring about [statements] not freely self-determined.'"  *United States v. Kaba*, 999 F.2d 47, 51 (2d Cir.) (quoting *United States v. Guarno*, 819 F.2d 28, 30 (2d Cir. 1987) (citations omitted)), *cert. denied*, 510 U.S. 1003 (1993).  The totality of the circumstances include:  "(1) the characteristics of the accused, (2) the conditions of the interrogation, and (3) the conduct of law enforcement officials."  *United States v. Awan*, 384 F. App'x 9, 14 (2d Cir. 2010) (quoting *Green v. Scully*, 850 F.2d 894, 901-02 (2d Cir.), *cert. denied*, 488 U.S. 945 (1988)), *cert. denied*, 131 S. Ct. 969 (2011).  Where circumstances suggest evidence of "brutality, [p]sychological duress, threats, [or] unduly

prolonged interrogation," statements will be deemed involuntary. *United States v. Moore*, 670 F.3d 222, 233 (2d Cir.) (alteration in original) (quoting *United States v. Verdugo*, 617 F.3d 565, 575 (1st Cir. 2010), *cert. denied*, 131 S. Ct. 954 (2011)), *cert. denied*, 133 S. Ct. 48 (2012). The government bears the burden of demonstrating by a preponderance of the evidence that a defendant's statement was voluntary. *Missouri v. Seibert*, 542 U.S. 600, 608 n.1 (2004).

Although a defendant's mental state is important in assessing the voluntariness of his statements, "a defendant's mental condition, by itself and apart from its relation to official coercion" does not "dispose of the inquiry into constitutional 'voluntariness.'" *Colorado v. Connelly*, 479 U.S. 157, 164-65 (1986) ("while mental condition is surely relevant to an individual's susceptibility to police coercion, mere examination of the confessant's state of mind can never conclude the due process inquiry"); *United States v. Guerro*, 983 F.2d 1001, 1004 (10th Cir. 1993) ("[due process] does not protect against conduct by private parties, . . . nor does it protect a defendant from his own compulsions or internally-applied pressures which are not the product of police action"). Instead, "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary.'" *Colorado v. Connelly*, 479 U.S. at 167; *see United States v. Raymer*, 876 F.2d 383, 386 (5th Cir.) ("[t]he relevant test . . . focuses . . . on the presence or absence of police coercion"), *cert. denied*, 493 U.S. 870 (1989).

"A diminished mental state is only relevant to the voluntariness inquiry if it made mental or physical coercion by the police more effective." *United States v. Salameh*, 152 F.3d 88, 117 (2d Cir. 1998) (quoting *United States v. Chrisman*, 965 F.2d 1465, 1469 (7th Cir. 1992)), *cert. denied*, 525 U.S. 1112 (1999). If an individual's "mental impairment . . . should have reasonably been apparent to . . . interrogators, . . . a lesser quantum of coercion [may] render the confession involuntary." *Nickel v. Hannigan*, 97 F.3d 403, 410 (10th Cir. 1996) (quoting *United*

*States v. Sablotny*, 21 F.3d 747, 752 (7th Cir. 1994)), *cert. denied*, 520 U.S. 1106 (1997).  "In other words, the police must somehow overreach by exploiting a weakness or condition known to exist."  *United States v. Robertson*, 19 F.3d 1318, 1321 (10th Cir.), *cert. denied*, 513 U.S. 906 (1994); *Miller v. Dugger*, 838 F.2d 1530, 1537 (11th Cir.) ("*Connelly* makes clear that even the interrogators' knowledge that a suspect may have mental problems does not make the suspect's statements involuntary unless '[t]he police exploited this weakness *with coercive tactics*'") (quoting *Connelly*, 479 U.S. at 165), *cert. denied*, 486 U.S. 1061 (1988).

Parker maintains that his statements to Blackerby were not voluntary because "Blackerby took advantage of his mental condition, medication and hospitalization and questioned [him] about his hallucinations," despite the fact that he had voluntarily sought medical treatment to ensure that he did not act on the hallucinations.  (Docket # 48 at 4).  According to Parker, at the time of the interview, he was hospitalized, had recently taken medications with sedative effects, had been assessed with a low GAF as a result his continued hallucinations, and indeed appeared to experience a hallucination during the interview.  (Docket ## 37 at 5-7; 48 at 2-3).  Parker contends that his subsequent inability to recall his interview with Blackerby is further evidence that his statements were not the product of a knowing and willing decision to speak with law enforcement.  (Docket # 37 at 6-7).

A careful review of the witnesses' credible hearing testimony demonstrates that although Parker had taken medication during the interview and suffered an apparent hallucination during the interview, he nonetheless appeared to understand and appropriately respond to Blackerby's questions.  They testified that Parker was calm and cooperative throughout the interview, with the exception of some agitation during the hallucination.  According to Landy, Parker's affect was generally cautious and constricted during the interview,

without significant difficulties.  (Tr. 23-25, 38).  Both Blackerby and Dean described Parker as

calm and soft-spoken during the interview.  (Tr. 70, 106, 111).  Despite Parker's continued

hallucinations, Landy opined that Parker understood why he was being interviewed and the

purpose of the interview.  He also testified that Parker was "doing pretty well in terms of his

psychosis" during the interview and that he did not demonstrate any evidence of thought

disorder.  (Tr. 23-25, 38).  Both Landy and Dean testified that they would have stopped the

interview if they had believed that termination was appropriate given Parker's mental health, and

neither did.  Although they testified that Parker's medications were capable of causing

drowsiness, they did not think that the medications had a sedative effect on Parker.  Landy

further testified that Parker's later inability to recall the interview could have been attributable to

retrograde amnesia caused by Parker's later pulmonary embolism and did not mean that he had

not understood what was happening at the time of the interview.

With respect to the characteristics of the interrogation itself, the record does not

reveal any coercive or overreaching tactics employed by Blackerby.  Before the interview,

Blackerby met with Landy and Dean to inquire about Parker's mental status in order to ensure

that Parker was of "a clear mind and okay with the interview."  (Tr. 94).  Although Landy had

expressed reservations about proceeding with the interview on the preceding day, neither he nor

Dean articulated any concerns about Parker's fitness to proceed on the date of the interview.

Parker was informed of the interview by Landy and Dean, and both were present

for the interview.  As stated previously, but relevant also to this analysis:  Parker was not

restrained or physically compelled to attend the interview, and he was seated closest to the door

of the conference room; Blackerby identified himself, informed Parker that he was investigating

Parker's threats against the President, that the interview was voluntary and that Parker did not

have to speak to him; Blackerby asked open-ended questions in a conversational tone and did not threaten Parker or make any promises to induce him to speak; Blackerby was the only law enforcement official present, was dressed in civilian clothing and was not armed; and, the interview lasted between sixty and ninety minutes, at the conclusion of which Parker stood and walked out of the unlocked door to the conference room.

In sum, the record shows that Blackerby consulted with Parker's treatment providers prior to commencing the interview, permitted Parker's treatment team to attend the interview, and conducted the interview in a calm and non-coercive manner. The treatment providers were present to "support" Parker and were prepared to end the interview if they thought Parker's condition warranted it. "Police officers must, of course, be sensitive to a suspect's mental condition . . . and must exercise caution when dealing with a suspect whose compromised mental state is known to them." *United States v. Hughes*, 640 F.3d 428, 440 (1st Cir. 2011). In this case, when informed of a potentially dangerous threat to the President made by an individual who suffered ongoing hallucinations but otherwise appeared lucid, Blackerby acted with restraint and professionalism during the interview, hardly the hallmarks of coercive or overbearing tactics. *See*, *e.g.*, *id.* at 440 ("[w]here, as here, a person's compromised mental state is known to interrogating officers, a lesser quantum of coercion is required[;] . . . [n]evertheless, some significantly probative evidence of coercion is required"); *Nickel v. Hannigan*, 97 F.3d at 411 ("[h]ere there is no evidence of, nor does [defendant] even expressly allege the existence of, police coercion[;] . . . [the defendant's] mental condition, in the absence of any evidence of police coercion, does not alone make his statements to the police involuntary"); *Miller v. Dugger*, 838 F.2d at 1536 ("[v]oluntariness is determined by an assessment of the totality of the circumstances, but that assessment must include an element of official overreaching to warrant a

conclusion that a confession is involuntary under constitutional law"); *Webster v. McDonough*, 2007 WL 2698719, * 8 (N.D. Fla. 2007) ("[t]he 'essential link' between a confession and a constitutional violation is police coercion, not mental illness").

Parker contends that Blackerby took advantage of his mental condition by questioning him at all.  (Docket # 48 at 4).  In essence, Parker contends that his statements were involuntary because they were made in response to questioning by Blackerby at a time when Blackerby knew that he was medicated and experiencing hallucinations.

The Supreme Court's decision in *Colorado v. Connelly* strongly undercuts, even if it does not squarely foreclose, Parker's suppression motion.  The defendant in *Connelly* was suffering from "command hallucinations" that instructed him to either confess to a crime or to commit suicide.  479 U.S. at 161.  Complying with the voices that he heard, the defendant approached law enforcement and confessed to a crime.  *Id.* at 160.  The defendant also told the officer that he had not consumed any alcohol or drugs, but that "he had been a patient in several mental hospitals."  *Id.*  The Supreme Court rejected the contention that the confession should be suppressed solely because of the defendant's mental state at the time he made the confession, noting that "[o]nly if we were to establish a brand new constitutional right – the right of a criminal defendant to confess to his crime only when totally rational and properly motivated – could respondent's present claim be sustained."  *Id.* at 166.  Rather, the Court held that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause."  *Id.* at 167.

Applying *Connelly*, courts have repeatedly rejected arguments that a statement made in response to law enforcement interrogation is involuntary solely due to the confessor's diminished mental state, regardless of whether the mental deficit stems from intoxication or from

psychological impairments. *See United States v. Hughes*, 640 F.3d at 438-39 (statements were voluntary despite defendant's panic attack and his known history of suicidal ideation where the interview was cordial, reasonable in length, and where no threats or inducements were employed); *United States v. Barbour*, 70 F.3d 580, 585 (11th Cir. 1995) ("the fact that [the defendant] was suffering severe depression does not render his statements involuntary unless the agents took advantage of his mental illness; . . . [a]bsent any evidence of psychological or physical coercion on the part of the agents, there is no basis for declaring [the defendant's] statements . . . involuntary"), *cert. denied*, 517 U.S. 1147 (1996); *United States v. Robertson*, 19 F.3d at 1321 (statements defendant made in hospital after suffering head injury were voluntary; although defendant inaccurately stated his age and how long he had been in the hospital, he otherwise seemed lucid and officer had consulted with social worker and doctor prior to interview to determine whether defendant was taking medication that could affect his mental state); *United States v. Guerro*, 983 F.2d at 1003 ("[law enforcement] did not utilize improper interrogation tactics or coerce [defendant;] [r]ather, it was the combination of the circumstances existing at the time of the statement and the characteristics of [the defendant] that led the [district] court to the [erroneous] conclusion that the statement was involuntary"); *United States v. Raymer*, 876 F.2d at 386-87 (defendant's confession was voluntary even though he was interviewed while confined to prison hospital after injuring himself, was in pain, had taken prescription drugs and had a limited education, where the interview lasted forty-two minutes, defendant was permitted to leave upon request and defendant was not under the influence of medication on the day of the interview); *Miller*, 838 F.2d at 1532, 1537 (confession voluntary even though defendant told officers that he was "mentally disturbed" and at times appeared confused and disoriented, where officers did not threaten, use physical force against or make

25

promises to defendant and where interrogation was not lengthy); *Webster v. McDonough*, 2007 WL 2698719 at *8-9 (statements not coerced despite fact that defendant had requested a psychiatrist in absence of evidence that defendant's mental defect was exploited); *United States v. Lambert*, 351 F. Supp. 2d 1154, 1163 (D. Kan. 2004) (defendant's statements were voluntary even though officers knew that he had taken methamphetamine prior to the interview where defendant otherwise appeared alert and coherent and there was no evidence to suggest that the officers exploited his intoxicated state); *Gardner v. Galetka*, 2003 WL 25513130, *20 (D. Utah 2003) (statements were voluntary where the defendant was hospitalized, recovering from surgery and under the influence of a significant amount of medication; "the court concludes that [the officer's] conduct does not rise to the level of the gross exploitation that courts have found in the past violated a defendant's . . . rights"), *adopted as modified*, 2007 WL 1071400 (D. Utah 2007).

Parker relies upon the Second Circuit's decision in *United States v. Taylor*, 745 F.3d 15 (2d Cir. 2014), for the proposition that Blackerby's questioning of him, given his known diminished mental state, was coercive and rendered his statements involuntary.  (Docket # 48 at 6).  In *Taylor*, an admittedly "close case" for the Second Circuit, the defendant was interrogated for approximately two to three hours after ingesting a "bottle-full of Xanax pills."  *Id.* at 19-21. Law enforcement officers testified that although the defendant demonstrated intermittent periods of lucidity during the interrogation, at other times his body appeared to be "shutting down" and he repeatedly fell asleep during questioning.  *Id.*  After the interrogation, the defendant was taken to the hospital where he spent the remainder of the day sleeping.  *Id.*

The following day, the defendant was evaluated by a psychologist, who indicated that the defendant drooled, stared blankly and gave vague responses that lacked spontaneity.  *Id.* The psychologist opined that the defendant's thought process was impaired.  *Id.*  After the

evaluation, the defendant was transported for his arraignment.  *Id.*  At the courthouse, the defendant asked to speak with law enforcement and, after being re-advised of his *Miranda* rights, he provided further statements.  *Id.*  The Second Circuit determined that the defendant's statements were involuntary, reasoning that "the officers' persistent questioning took undue advantage of [the defendant's] diminished mental state, and ultimately overbore his will."  *See id.* at 25.  According to the Second Circuit, "when a person is unconscious or drugged or otherwise lacks capacity for conscious choice, a confession cannot be voluntary."  *Id.* at 24 (internal quotations omitted).

> *Taylor* is distinguishable from this case.  Unlike the defendant in *Taylor*, Parker was awake and, according to the witnesses, generally coherent throughout the interview.  Indeed, Landy, Parker's treating psychologist, opined that Parker was able to understand the purpose of the interview and, although he suffered a hallucination during the questioning, did not demonstrate any thought disorder.  When Parker appeared to experience the hallucination, neither Landy nor Dean attempted to terminate the interview despite informing Blackerby that they would do so if they had believed it appropriate for Parker's mental health.  Nothing in *Taylor* suggests that the officers in that case sought medical input as to the defendant's ability or fitness to participate in an interview.  Here, by contrast, the record demonstrates that Blackerby conducted the interview only after obtaining clearance from Landy.  Under the totality of the circumstances, I do not find that Blackerby "took undue advantage of [Parker's] diminished mental state" by questioning him at the Hospital.  *See id.* at 25.

C.      **Privilege**

Finally, Parker contends that the statements that he made to Blackerby[5] are

protected by the psychotherapist-patient privilege.[6]  (Docket # 37 at 8-10).  Parker contends that

because he went to the Hospital to seek treatment for his schizophrenia, *any* statement that he

made in the Hospital is covered by the privilege.  (*Id.* at 9).  According to Parker, the statements

that he made to Blackerby were made in the presence of Landy, who relied upon those

statements and his observations of Parker during the interview to inform his subsequent

treatment decisions.  (*Id.*).

"[F]ederal courts are required to recognize that confidential communications

between a licensed psychotherapist . . . and his or her patients in the course of diagnosis or

treatment are protected from compelled disclosure under Rule 501 of the Federal Rules of

Evidence."  *In re Sims*, 534 F.3d 118 (2d Cir. 2008) (citing *Jaffee v. Redmond*, 518 U.S. 1, 15

(1996)).  The privilege extends to communications made between a patient and licensed mental

health professionals.  *EEOC v. Nichols Gas & Oil, Inc.*, 256 F.R.D. 114, 119 (W.D.N.Y. 2009).

Additionally, in order to qualify as privileged, the communication must be made "in the course

of diagnosis or treatment"; thus, not every communication between a therapist and his patient are

necessarily privileged.  *United States v. Romo*, 413 F.3d 1044, 1048 (9th Cir. 2005), *cert. denied*,

547 U.S. 1048 (2006).

I find that the statements Parker made to Blackerby are not protected by the

psychotherapist-patient privilege.  The statements at issue were neither made to a licensed mental

---

[5]  Parker also contends that the statements that he made to Landy are covered by the privilege.  The government has represented, however, that it "is not seeking to use statements made between Parker and his treating psychiatrist, but rather the statement made directly to . . . Blackerby."  (Docket # 38 at 9).

[6]  While Parker's post-hearing submission does not address the psychotherapist-patient privilege, and thus it is unclear whether Parker is persisting in that argument, this Court will address it in the interests of completeness.

health professional, nor made in the course of Parker's treatment.  *See id.* at 1048-49 (statements

not privileged because they were not made in the course of treatment); *see also United States v.*

*Crews*, 781 F.2d 826, 831 (10th Cir. 1986) (defendant waived any applicable privilege when he

disclosed threats against the President to Secret Service agent who interviewed defendant at the

hospital after agent informed defendant that the interview was voluntary and that "he could . . .

leave that part of the hospital at anytime"); *United States v. Highsmith*, 2007 WL 2406990 at \*4

(threats against administrative law judge made to doctor after defendant voluntarily sought

admission to hospital seeking mental health treatment were protected by privilege, but statements

to law enforcement officers who interviewed defendant at the psychiatric unit were neither

privileged nor inadmissible fruits of the doctor's wrongful disclosure).

Parker cites no authority for his contention that his statements fall within the

privilege merely because they were made while he was in the Hospital and in the presence of his

mental health provider.  Indeed, the record reflects that Parker was informed of and understood

the purpose of the interview.  Blackerby identified himself as a Secret Service agent to Parker

and never suggested that he was part of Parker's treatment team.  Although both Landy and Dean

were present during the interview, neither of them made any comments, asked any questions or

otherwise participated in the interview.[7]  Under such circumstances, I conclude that Parker's

statements to Blackerby are not privileged.  *See United States v. Romo*, 413 F.3d at 1048-49

("that [the doctor] had previously provided [defendant] with therapy does not mean that every

---

[7]  Parker does not assert that the statements he made to Blackerby are inadmissible because they flowed
from a violation of the psychotherapist-patient privilege.  In any event, suppression of confessions under the "fruit of
the poisonous tree" doctrine requires a violation of a constitutional right.  *Highsmith*, 2007 WL 2406990 at \*4
(citing *Oregon v. Elstad*, 470 U.S. 298, 305 (1985)).  "The psychotherapist-patient privilege is not constitutionally
based[,] . . . [and] otherwise admissible evidence derived from statements made by [a mental health provider] which
are protected by an evidentiary privilege need not be suppressed."  *Id.*

interaction between the two constituted a therapy session, and this particular meeting involved no therapy").

## II.    <u>Outrageous Misconduct</u>

Finally, I turn to Parker's motion to dismiss the indictment under the Due Process Clause on the grounds that Blackerby engaged in outrageous governmental misconduct.  (Docket ## 37 at 9-13; 48 at 4-7).  Parker maintains that Blackerby interviewed him with the knowledge that he was "psychotic, medicated, having hallucinations, and confined to a psychiatric hospital." (Docket # 48 at 5).  According to Parker, knowing that Parker was in a susceptible state, Blackerby questioned him concerning the threats that he had made against the President.  Parker maintains that his responses to those questions unfairly form the basis of the pending charge. Parker maintains that Blackerby took advantage of his diminished capacity and that the government is, in essence, "criminalizing the thoughts of a mentally ill person."  (*Id.*).

According to the Second Circuit, although a claim of outrageous government conduct is "frequently raised [and] seldom succeeds," it must be "taken seriously because ensuring that the government does not trample in an unconscionable manner on individual dignity is a bed-rock duty of judicial officers."  *United States v. Schmidt*, 105 F.3d 82, 91 (2d Cir.), *cert. denied*, 522 U.S. 846 (1997).  Under certain circumstances, government conduct may reach such a "demonstrable level of outrageousness" as to justify barring conviction.  *Hampton v. United States*, 425 U.S. 484, 495 n.7 (1976) (Powell, J., concurring); *see United States v. Al Kassar*, 660 F.3d 108, 121 (2d Cir. 2011) ("[t]o establish a due process violation on th[e] ground [of outrageous government misconduct], a defendant must show that the government's conduct is so outrageous that common notions of fairness and decency would be offended were

judicial processes invoked to obtain a conviction") (internal quotation omitted), *cert. denied*, 132

S. Ct. 2374 (2012).  The inquiry should "turn on whether the governmental conduct, standing

alone, is so offensive that it 'shocks the conscience' regardless of the extent to which it led the

defendant to commit his crime.'"  *United States v. Cromitie*, 727 F.3d 194, 218-19 (2d Cir. 2013)

(quoting *United States v. Chin*, 934 F.2d 393, 398 (2d Cir. 1991)), *cert. denied*, 135 S. Ct. 53

(2014); *see also United States v. Myers*, 692 F.2d 823, 836 (2d Cir. 1982) ("due process claim

focuses on the conduct of the government agents"), *cert. denied*, 461 U.S. 961 (1983).

> In a strikingly similar case, the Fifth Circuit held that the questioning of an inmate
held in the psychiatric unit of a prison regarding threats made against the President did not
constitute outrageous government conduct.  *United States v. Smith*, 7 F.3d 1164, 1169-70 (5th
Cir. 1993).  In *Smith*, the defendant communicated to a fellow inmate threats against the
President.  *Id.* at 1165.  The prison warden, after concluding that the defendant was not
psychotic, alerted the Secret Service of the threat.  *Id.*  Two agents subsequently interviewed the
defendant in the warden's office without advising the defendant of all of his *Miranda* rights.  *Id.*
The defendant was indicted for threats against the President that were communicated to the other
inmate and to the agents.  *Id.* at 1166.

> The Fifth Circuit rejected the defendant's contention that the agents' questioning
constituted outrageous government conduct.  *Id.* at 1169-70.  According to the court, the agents
identified themselves to the defendant and informed him of the purpose of the interview.  *Id.*
Acknowledging that the agents' questions to the defendant, which included questions concerning
his feelings towards the President, conceivably could have elicited a renewed threat against the
President, the court reasoned that the agents were charged with ensuring the President's safety
and found that their conduct was "appropriate and not unreasonable."  *Id.*  As the court stated:

31

> [I]f [the defendant] [were] merely mentally unbalanced, [but not insane,] it is the government's right . . . to prosecute him for the offense charged.  We note that it is frequently an unbalanced person who commits the offense of threatening – and sometimes of attempting to kill – a president.

*Id.*

Judged under applicable legal principles, I do not find that Blackerby engaged in the type of outrageous conduct that could constitute a violation of Parker's due process rights. As discussed at length above, Blackerby delayed questioning Parker based upon Landy's input, discussed Parker's mental status with Landy and Dean prior to commencing the interview, permitted Landy and Dean to attend the interview, and after identifying himself to Parker, questioned Parker in a non-coercive, non-confrontational manner for no longer than ninety minutes.  Although Parker appeared to experience a hallucination during the interview, neither of his mental health treatment providers apparently felt that such occurrence was sufficiently severe in character, duration or effect to warrant terminating the interview.  That a law enforcement officer, not licensed as a mental health provider, did not make a contrary decision and end the interview on his own does not implicate the Due Process Clause, in my estimation.  For these reasons, I conclude that Blackerby's interrogation of Parker did not amount to outrageous conduct.  *United States v. Smith*, 7 F.3d 1164, 1169-70 ("[a]s an agent of the governmental agency charged with the President's safety, [the agent] was responsible for determining the seriousness of [defendant's] threat[;] . . . [i]f this [c]ourt is ever to apply the outrageous government conduct defense, it should not apply on facts such as these"); *United States v. Lincoln*, 255 F. Supp. 2d 1169, 1172-73 (D. Or. 2003) (denying motion to dismiss charges of threatening the President on the grounds of outrageous government conduct where agent questioned defendant concerning his feelings about the President; "[a]s an agent of the

governmental agency charged with maintaining the President's safety, [the agent] attempted to determine the seriousness of defendant's threats[;] [q]uestions concerning defendant's feeling about the President were therefore necessary and proper"), *overruled on other grounds*, 403 F.3d 703 (9th Cir. 2005).

Parker contends that Blackerby's conduct was outrageous because Parker was confined to the Hospital and thus did not present a current threat to the President.  (Docket ## 37 at 9; 48 at 4-5).  I disagree.  Although Blackerby knew that Parker was confined to the Hospital, he understood that Parker might be confined for a period as short as a few days and, in any event, he did not know specifically when the release would occur.  *See United States v. Schmidt*, 105 F.3d at 92 ("[h]ad the government not launched its sting operation, [defendant] contends she would have simply remained in the mental observation unit, talking to anyone who would listen to her[;] [h]owever, it is also possible that she would have eventually found an inmate willing to help her carry out her detailed instructions to kill federal agents and assist her in an escape beyond this country's borders").  In addition, Blackerby did not immediately interview Parker, but instead waited a day at Landy's request.[8]

Finally, Parker argues that the decision to prosecute him for statements that he made while voluntarily seeking treatment for the very mental health condition that he claims accounts for those statements directly contravenes sound public policy.  Parker reasons that prosecutions such as this risk intimidating individuals from seeking mental health treatment

---

[8] Insofar as Parker argues that his statements may not properly be characterized as "threats" because he made them solely in response to Blackerby's questioning (Docket ## 37 at 11-12; 48 at 5-6), the issue of the genuineness of the threats or an entrapment defense are more properly reserved for the jury.  *See, e.g., Smith*, 7 F.3d at 1169 ("[i]f the defendant suffers from a serious mental condition, it is possible that a jury may find for him on the defense of insanity[;] [h]is mental condition might also be something that could be considered at sentencing"); *United States v. Kirk*, 528 F.2d at 1063 ("jurors could reasonabl[y] have believed that [defendant] would not have made this threat on the President's life without the leading and suggestive questions posed to him by the Secret Service Agents").  Indeed, during the hearing, Parker made clear that his Due Process Clause challenge does not encompass the decision to prosecute him, only Blackerby's conduct in questioning him while he was a mental health patient at the Hospital.  (Tr. 147).

33

necessary to avoid dangerous behavior.  Whether this Court agrees or disagrees with Parker's

assessment is constitutionally irrelevant.  The decision whether to criminalize threats made by

the mentally ill during mental health hospitalization "is a policy question for Congress, not the

courts."  *United States v. Auster*, 517 F.3d 312, 320 n.31 (5th Cir.), *cert. denied*, 555 U.S. 840

(2008).  Moreover, "[t]he 'execution of the federal laws under our Constitution . . . is confided

primarily to the Executive Branch of the Government, subject to applicable constitutional and

statutory limitations.'"  *United States v. Dyke*, 718 F.3d 1282, 1285 (10th Cir.) (quoting

*Hampton v. United States*, 425 U.S. at 490), *cert. denied*, 134 S. Ct. 365 (2013).  In other words,

the court has limited authority under the Due Process Clause to review a prosecutor's

determination of whether and when to execute the laws – authority that "come[s] into play only

when the [g]overnment activity in question violates some protected right of the *[d]efendant*."  *Id.*

(alterations in original).  In this case, as discussed at length above, I conclude that Blackerby's

conduct did not violate Parker's challenged constitutional rights.  Accordingly, I recommend that

Parker's motion to dismiss the indictment on the grounds of outrageous government misconduct

be denied.


## CONCLUSION

For the reasons stated above, I recommend that Parker's motions to suppress

statements and to dismiss the indictment (Docket ## 37, 48) be denied.

**IT IS SO ORDERED.**


                                                        *s/Marian W. Payson*
                                                  _____
                                                        MARIAN W. PAYSON
                                                  United States Magistrate Judge

Dated: Rochester, New York
       May 29, 2015

34

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

   **ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

   **ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 59(b) of the Local Rules of Criminal Procedure for the Western District of New York.[9]

   The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance.  *See, e.g., Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.,* 840 F.2d 985 (1st Cir. 1988).

   **Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.**  *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Ltd.,* 838 F.2d 55 (2d Cir. 1988).

   The parties are reminded that, pursuant to Rule 59(b) of the Local Rules of Criminal Procedure for the Western District of New York, "[w]ritten objections . . . shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority."  **Failure to comply with the provisions of Rule 59(b) may result in the District Court's refusal to consider the objection.**

   Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the parties.

**IT IS SO ORDERED.**


                                                    *s/Marian W. Payson*
                                                    MARIAN W. PAYSON
                                                    United States Magistrate Judge


Dated: Rochester, New York
          May 29, 2015

---

   [9]  Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. § 3161(h)(1)(D) commences with the filing of this Report and Recommendation.  Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the fourteen days allowed for filing objections has elapsed.  *United States v. Andress*, 943 F.2d 622 (6th Cir. 1991); *United States v. Long*, 900 F.2d 1270 (8th Cir. 1990).